UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

GREGORY O'DELL,

        Plaintiff,

v.                                    Civil Action No. 2:13-12894

ZURICH AMERICAN INSURANCE COMPANY,

        Defendant.

MEMORANDUM OPINION & ORDER

        Pending are cross motions for summary judgment, each filed on October 21, 2013.  At the court's request, the parties recently supplemented the factual record.  The matter is now ripe for disposition.

I. Background

        In this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461 (2012), the plaintiff, Gregory O'Dell, seeks to recover benefits under a permanent and total disability policy sponsored by O'Dell's employer, American Electric Power Company, Inc. ("AEP"), and underwritten by the defendant, Zurich American Insurance Company

("Zurich").  To date, no benefits have been paid to O'Dell on the Zurich policy.

The pending motions raise two significant questions: Did Zurich properly deny O'Dell's claim for benefits as untimely and, if not, does the policy cover his claimed disability?

A.  O'Dell's Employment, Accident, and Injuries

Beginning in 1997 O'Dell was employed as a maintenance supervisor at an AEP coal processing facility in Langsville, Ohio.  Joint Stipulation of the Parties ("Joint Stip.") ¶ 2. While commuting to work on September 29, 1999, he was involved in a motor vehicle accident.  Joint Stip. ¶ 4.  According to the police report, O'Dell, who was 50 years old at the time, was traveling north when a vehicle in the southbound lane lost control, causing a head-on collision.  Record ("R.") at 15-16.[1] O'Dell was knocked unconscious for approximately forty-five minutes, Joint Stip. ¶ 5, transported from the scene to Pleasant Valley Hospital, and later transferred to Charleston Area Medical Center ("CAMC"), where he was admitted for treatment, R. at 16, 20.

---

[1] The court uses the pagination generated by the ECF filing system.

2

X rays and other diagnostic testing conducted at both hospitals revealed several left rib fractures, and a fracture to O'Dell's left clavicle.  R. at 20-22, 40.  Examination of the thoracic spine showed "degenerative changes with no evidence of any fracture."  R. at 40.  O'Dell's lumbar spine showed "some narrowing of the L3-4 disk space with an old compression fracture of the inferior plate of [the] L2" vertebrae.  Id. Initial examination of O'Dell's head suggested a possible intracranial hematoma, R. at 25-28, but a subsequent CT scan "revealed no evidence of any intracerebral or cerebellar bleeding," R. at 40.

O'Dell was discharged from CAMC, after three days, on October 3, 1999, and thereafter sought outpatient treatment from a number of physicians over the course of several years.  His claimed maladies, which are described in greater detail below, included chronic back pain, leg pain, vertigo, and dizziness. Despite treatment, he contends those symptoms did not abate.  By March, 2001, Dr. Jimmy Adams, an osteopathic physician specializing in pain management, opined that "Mr. O'Dell's condition [wa]s chronic," and remarked that he was not "very hopeful that [O'Dell] would be able to return to work."  R. at 88.  The next month, Dr. Adams clarified that "Mr. O'Dell ha[d] a chronic pain syndrome which [wa]s related to injuries

sustained in motor vehicle accidents." R. at 90. He added that O'Dell's injuries had "left him with poor tolerance for engagement in physical activities which would allow him to be gainfully employed," and concluded that "Mr. O'Dell [was] permanently disabled and unemployable for his previous occupation." Id.

In May 2001, Dr. Adams reaffirmed that, by that time, there was "no way that Mr. O'Dell c[ould] return to his previous profession." R. at 92. He confirmed that conclusion again in October 2001, R. at 96, and once more in February 2002, R. at 99. Finally, in December 2003, Dr. Adams again stated that O'Dell was "permanently and totally disabled," and added that "due to [O'Dell's] chronic vertigo and dizziness, [he] would be quite guarded in sending Mr. O'Dell to work." R. at 142. The parties agree that O'Dell did not return to work following his accident. Joint Stip. ¶ 6.

### B. O'Dell's Coverage

Shortly after beginning his employment with AEP, O'Dell became eligible for Long Term Disability benefits (the "LTD Plan"). R. at 61. Those benefits were provided by AEP at no cost to O'Dell, id., and appear to have been initially underwritten by the Kemper Insurance Company, see Plaintiff's

4

Supplemental Memorandum ("Pl.'s Supp. Mem."), Ex. A (letter from Kemper discussing the "American Electric Power Salaried Long Term Disability Plan").  The terms of the LTD Plan are not within the record, and that coverage is not in issue here. Indeed, there is no evidence in the record that Zurich played any role in administering or paying benefits under the LTD Plan.

O'Dell had enrolled in an Optional Accidental Death & Dismemberment Plan underwritten by Zurich.  Joint Stip. ¶ 3. The parties identify the source of that coverage as Zurich's "Policy No. GTU 8364076" (the "Policy"); it contains two potential sources of disability coverage.  First, under the heading "INSURANCE UNDER THIS POLICY," paragraph 1.C states that Zurich would pay a "Weekly Income" benefit if a Covered Person[2] "sustain[ed] total disability as a result of an injury and within 30 days of an accident[.]"  R. at 159.  However, the first page of the Policy states that "[t]here is no coverage for any Benefit marked 'none'", and the Weekly Income category of benefits is marked with the designation "None".  R. at 157. Despite this clear language, O'Dell attempts to frame his claim for relief on the Weekly Income category which, if it applied,

---

[2] The Policy defines a Covered Person as any "full time regular or probationary employee of [AEP] . . . who [is] under the age of 70," with exceptions not material here.  R. at 159, 163.

5

would have extended the time for filing his proof of claim; but by definition it does not apply to him.

Second, a rider to the Policy provides for "PERMANENT AND TOTAL DISABILITY" coverage.  R. at 165.  That provision appears to have been added as an endorsement on January 6, 1997, approximately eighteen months after the Policy became effective, but prior to O'Dell's employment at AEP.  It states:

> In the event a Covered Person is totally disabled as the result of an injury, within 180 days of an accident, so as to be unable to engage in his own occupation, and if (a) he remains so disabled for a period of 12 consecutive months and (b) at the end of such 12 month period he is totally and permanently disabled so as to be unable, for the remainder of his life, to engage in any occupation or employment for which he is reasonably qualified by training, education or experience, the Company[3] will pay the Covered Person weekly disability benefits for as long as the disability continues up to 500 weeks. Satisfactory proof of continued total disability must be furnished to the Company each year.

Id.  An "injury" is defined elsewhere in the Policy as "an accidental bodily injury which is a direct result, independent of all other causes, of a hazard set forth in the 'Description of Hazards.'"  R. at 158.  And the Description of Hazards states that the Policy insures against "[i]njury sustained by [a Covered Person] anywhere in the world[,]" except certain

---

[3] The term "the Company" is not defined in the Policy; however, AEP is identified as the "Policyholder," rather than the Company.

"aircraft exclusions" not applicable here.  R. at 162, 174.  On the other hand, the Policy excludes coverage for "any claim that is caused by, contributed to, or results from," among other things, "[i]llness or disease."  R. at 160.

Finally, the Policy also contains a "Waiver of Premium Benefit" that provides as follows:

> If a Covered Person becomes totally disabled and is eligible for benefits under the Policyholder sponsored Long Term Disability Program, the premiums due to this insurance will be waived while such person is receiving LTD Benefits.

R. at 168.

### C. O'Dell's Claim

The Policy explains "How to File a Claim":

> 1. Notice. The Covered Person or beneficiary, or someone on his or her behalf, must give us written notice within 90 days of the accident.  The notice must name the Covered Person and the policy number.  Send notice to the Accident and Health Department.  The Zurich Insurance Company, 59 Maiden Lane, New York, N.Y. 10038 or any of our agents.  Notice to our agent is notice to us.
>
> 2. Claim Forms. We will send the claimant Proof of Loss forms within 15 days after we get the notice.  If the claimant does not get the Proof of Loss forms in 15 days he or she can send us a detailed written report of the claim and extent of the loss.  We will accept this report as a Proof of Loss if sent within the time fixed below for filing Proofs of Loss.
>
> 3. Proof of Loss. Written Proof of Loss must be sent to us within 90 days of the loss for all coverages except Weekly Income.  For Weekly Income, the Proof of Loss must be sent within 90 days of the last payment.  Failure

> to furnish the proof within such time shall neither
> invalidate nor reduce any claim if it was not reasonably
> possible to furnish the proof and the proof was furnished
> as soon as reasonably possible.

R. at 160.

Reading these provisions together, it appears that, in the ordinary course, the insured initiates the claim process by submitting notice of an accident to Zurich or one of its agents. Zurich then responds by sending the insured what are synonymously referred to as "Claim Forms" or "Proof of Loss forms."  The insured must then submit proof of loss within the specified time period using the Claim/Proof of Loss forms or, if those forms are not received, by submitting "a detailed written report of the claim and extent of the loss."

O'Dell's attempts to obtain benefits followed a different course.  The parties agree that, following the September 29, 1999 car accident, O'Dell received some form of short-term disability benefits under the "AEP plan."  Joint Stip. ¶ 6.  After those benefits expired, O'Dell began receiving benefits under the LTD Plan in a gross amount of $2,940.00 per month.  Pl.'s Supp. Mem., Ex. A.  According to the plaintiff, Kemper and a series of other insurers -- but never Zurich -- paid the LTD Plan benefits until December of 2013, when O'Dell reached the age of sixty-five.  Pl.'s Supp. Mem. at ¶¶ 1-2. Zurich agrees, maintaining that it did not pay any long-term

disability benefits to O'Dell at any time.  Defendant's
Supplemental Memorandum ("Def.'s Supp. Mem."), Ex. A.

       Nevertheless, the parties agree that, "[o]n January
31, 2000," AEP's Claim Administrator, Jerry W. Well, "certified
that O'Dell '[wa]s totally disabled and ha[d] been determined to
be eligible for benefits under the Company's Long-Term
Disability Plan' due to 'fractured back, ribs, shoulder and
concussion'[.]"  Joint Stip. ¶ 7; R. at 60.  Mr. Well's
certification appears on a form titled "AMERICAN ELECTRIC POWER
SYSTEM [-] CERTIFICATION OF TOTAL DISABILITY [-] OPTIONAL
ACCIDENTAL DEATH AND DISMEMBERMENT" (the "Certification Form").
R. at 60.  It stated that O'Dell's disability was the result of
an accident; that the disability began on September 30, 1999;
that O'Dell had been "approved" for long-term disability
benefits on November 30, 1999; and noted a principal sum of
$300,000 in benefits.  Id.  Attached to the Certification Form
were copies of enrollment records, indicating that O'Dell
elected $300,000 in coverage under an "Optional Accidental Death
& Dismemberment Plan."

       At the bottom of the Certification Form, just above
Mr. Well's signature, the following additional language is
found:

9

> This is to certify that the above named employee is
> totally disabled and has been determined to be eligible
> for benefits under the Company's Long Term Disability
> Plan.  Please certify that premiums will be waived for
> the employee's coverage during the continuation of Long
> Term Disability benefits beginning   March, 2000  .

R. at 60.  Just below that text, the Certification Form states,

"Waiver of Premium is approved."  The approval is countersigned

on behalf of Zurich, and dated February 22, 2000 -- roughly

three weeks after the Certification Form was signed by Mr. Well.

Zurich's own internal claim processing notes identify Marilyn

Palkin as the person who signed the waiver, R. at 14, and the

parties agree that the waiver was effective, stipulating that

"[Zurich] waived premium payments for [O'Dell's] policy as of

March, 2000, for Policy Number GTU-8364076."  Joint Stip. ¶ 8.

        Thus, by the Spring of 2000, it appears that AEP had

approved O'Dell to receive benefits under the LTD Plan; and

Zurich had waived premiums due under the Policy, in keeping with

the waiver benefit available when a "Covered Person becomes

totally disabled and is eligible for benefits under the

Policyholder sponsored Long Term Disability Program."  But while

O'Dell had applied for and received a premium waiver from

Zurich, it is stipulated that he did not submit a "signed

Disability Claim Form" to Zurich for the September 29, 1999

accident until considerably later -- sometime in 2003.[4]  <u>See</u>

Joint Stip. ¶ 9.

O'Dell submitted his first claim form on March 28,

2003, seeking coverage for "multiple injuries result of

automobile accident."  One page of the form appears to have been

completed by Dr. Adams and describes the injuries as:

> Chronic Cervicogenic[5] & Lumbosacral Pain, Arthropathy, Degenerative
>
> Disc disease, Vertigo, depression.

---

[4] The parties have stipulated that the signed claim form was
submitted on July 7, 2003, <u>id.</u>, but other evidence in the record
indicates that O'Dell may have registered his claim with Zurich
in some less formal manner by a slightly earlier date, <u>see</u> R. at
110 (letter dated May 15, 2003 from Zurich to O'Dell
"acknowledg[ing] receipt of" a claimed loss under the Policy and
directing O'Dell to, among other things, properly complete an
enclosed claim form); <u>see also</u> R. at 148 (letter dated March 16,
2004 stating that Zurich first received notice of O'Dell's loss
on May 14, 2003, "with a signed claim form later provided . . .
on [July 7, 2003.]").

[5] It is not clear what is meant by cervicogenic pain.  Literature
available to the court discusses two cervicogenic conditions:
One, "cervicogenic headache," is a disorder by which chronic
pain is referred to the head from the bony structures or soft
tissues of the neck.  David M. Biondi, <u>Cervicogenic Headache: A
Review of Diagnostic and Treatment Strategies</u>, 105 J. Am.
Osteopathic Assoc., Supp. 2, April 2005, at S16.  The second
condition, known as cervicogenic dizziness, "is most often
associated with flexion-extension injuries and has been reported
in patients with severe cervical arthritis, herniated cervical
discs, and head trauma. . . . . The concurrence of dizziness
complaints and cervical spine dysfunction is commonly associated
with flexion-extension injuries (whiplash) acquired in a motor
vehicle accident."  Diane M. Wrisley, et al., <u>Cervicogenic
Dizziness: A Review of Diagnosis and Treatment</u>, 30 J.
Orthopaedic & Sports Physical Therapy 755-56 (2000).

R. at 107-09.  On that same page it is stated that his disability is permanent and total.

On May 15, 2003, Karen Doyle, a Senior Claims Specialist for Zurich, wrote to O'Dell, acknowledging receipt of a claim under the Policy.  R. at 110.  "In order to continue with the processing of th[e] loss," Ms. Doyle requested that O'Dell provide a properly completed claim form, a copy of the motor vehicle accident report, a copy of O'Dell's enrollment card showing election of coverage, medical treatment records, and (in bold) "[r]eason for late notice of loss."  Id.  On the same day, Ms. Doyle also wrote to several physicians who treated O'Dell, and to the Point Pleasant Police Department, requesting records.  R. at 113-17.

O'Dell followed up with a second claim form on July 7, 2003, again requesting coverage for "multiple injuries as a result of automobile accident[.]"  R. at 119.  Like the March 28 submission, one page of the form appears to have been completed by Dr. Adams and sets forth O'Dell's ailments on three lines, of which the last half of the top line is unintelligible on the court's copy:

> Chronic myofascial/musculos[unintelligible, musculoskeletal?]
> Poor Tolerance for Physical Activity, Lumbar Facet Arthropathy
> Lumbar Degenerative Disc Disease, Cervical Arthropathy

On that same page it is stated that O'Dell is permanently and totally disabled.  R. at 120.

### D. Zurich's Decision

After several months spent corresponding with O'Dell's doctors and gathering records, Zurich denied O'Dell's claim for benefits on March 16, 2004.  R. at 148.  Quoting from the language in the Permanent and Total Disability rider, the denial letter acknowledged that the Policy provided coverage "[i]n the event a "Covered Person is totally disabled as the result of an injury, within 180 days of an accident, so as to be unable to engage in his own occupation, and if (a) he remains so disabled for a period of 12 consecutive months and (b) at the end of such 12 month period he is totally and permanently disabled[.]"  Id. It also quoted in full the Policy's Proof of Loss provision, which, as noted, provides that written proof of loss must be provided to Zurich within ninety days of "the loss" unless "it was not reasonably possible to furnish the proof and the proof was furnished as soon as reasonably possible."  Id.

After setting out the relevant Policy provisions, the denial letter stated that Zurich had reviewed "the Disability Claim Form completed and signed on [July 7, 2003]," the motor vehicle accident report, and medical records provided by several of O'Dell's physicians, but ultimately determined that O'Dell's

disability was not "the result of an accident, direct and
independent of all other causes[.]" Id. Rather, Zurich
concluded that "the disability was contributed to by several
underlying medical conditions," and therefore not covered
inasmuch as the Policy did not insure against injuries "caused
by, contributed to[,] or result[ing] from: . . . e. Illness or
disease." Id. Zurich also noted in support of its decision to
deny benefits that "the first notice of [the claim] was received
. . . on [May 14, 2003] . . . for a loss [that] occurred on
[September 29, 1999]," and that "[n]o reason for late notice was
provided." Id. Zurich then summarized that, in keeping with
the Policy provisions which (1) "exclude coverage for accidents
which are contributed to by an underlying medical condition,"
and (2) "advise regarding the period of time during which a
claim should be reported, Permanent Total Disability benefits
are denied." Id.

        Zurich nevertheless also advised O'Dell of his right
to appeal in writing within 60 days its decision to deny loss.
Specifically, Zurich advised him to include supplemental
documentation providing evidence that the loss was the result of
an accident, direct and independent, and not contributed to by
any underlying medical condition and to "provide your reasons
for submitting the loss almost four years after the date of the

                              14

loss." R. at 149.  No appeal was included in the record when
this case was initially filed, but, in response to the court's
inquiries, O'Dell has now submitted an appeal letter dated April
5, 2004.  Pl.'s Supp. Mem., Ex. B.  Zurich claims that, after
reviewing O'Dell's file, it was unable to "locate any documents
from Plaintiff wherein he requested an appeal," but "believes,
as with any review, [O'Dell] made a request for the same."
Def.'s Supp. Mem. at 5.

According to the appeal letter, O'Dell did not file
his claim until 2003 because he "was not aware of the disability
part of OADD until [he] was notified by one of [his] co-
workers."  Pl.'s Supp. Mem., Ex. B at 1.  He then "spent some
time making . . . calls to the HR [department] at AEP . . . to
get the right insurance company and address to file a claim,"
but "waited long periods of time before [he] was given Zurich's
name."  Id.  In the remainder of the letter, O'Dell explained
that any underlying condition "DID NOT keep [him] from
performing [his] job."  Id. at 2.  More specifically, O'Dell
noted that he was still having problems with dizziness that was
"a direct result of [the] head and neck injury [he] received
[from] the car accident"; that he "did not have any of these
problems until [his] unfortunate accident"; and that he "had
worked for AEP for [2.5] years[,] . . . 6 or 7 days a week, 9

hours, sometimes more per shift," before the accident.  Id. at 1-2.

On May 18, 2004, Zurich's "ERISA Committee" met and "requested that a copy of [O'Dell's] file be sent for an independent medical review."  R. at 151.  After reviewing O'Dell's case, Dr. Gerard Catanese confirmed Zurich's initial conclusion, opining "that Gregory O'Dell [sic] problems today are for the most part related to his pre-existing conditions and not the motor vehicle accident."  R. at 154.  More specifically, Dr. Catanese observed that X rays and other diagnostic images taken after the accident "were negative for new injuries or fractures [to the spine], and [] showed only pre-existing spinal degenerative disease and an old fracture of [O'Dell's] lumbar spine".  R. at 153-54.  He also failed to see "any proof" that O'Dell's dizziness was "related to the accident."  Id.

Finally, on June 14, 2004, Keith Firestone wrote to O'Dell "[o]n [b]ehalf of the ERISA Review Committee."  R. at 156.  He indicated that the Committee had reviewed Dr. Catanese's medical opinion, a copy of which he attached, and "affirmed the denial [of O'Dell's claim] based upon the grounds in the denial letter dated March 16, 2004."  Id.  The final denial letter did not discuss O'Dell's explanation for the

16

timing of his filing, or invite O'Dell to lodge any further appeal.

### E. This Action

O'Dell initiated this action on May 31, 2013.[6]  <u>See generally</u> Plaintiff's Complaint ("Compl.").  He challenges Zurich's decision to deny him benefits under § 1132(a)(1)(B) of ERISA, which permits a plan beneficiary to bring a civil action to, among other things, recover benefits due under a plan. Specifically, O'Dell alleges that Zurich "disregarded evidence of [his] disabilities, failed to conduct reasonable investigations of available medical information, did not attempt

---

[6] The parties do not address the reason for the gap of some nine years between the denial of O'Dell's claim and the filing of this lawsuit.  A reasonable conjecture is that O'Dell's interest in the Policy was reignited when he learned that his benefits under the LTD Plan were set to expire in 2013.  Whatever his reasons, O'Dell's delay does not bar his claims.  The Policy contains a contractual statute of limitations, stating that any "action against [Zurich] must be started within 3 years of the date the written proof of loss is required to be submitted," unless "the law of the state where the Covered Person lives makes such limit void[.]"  R. at 161.  Zurich noted that provision in its answer, but did not argue that O'Dell's claim was time-barred in its motion for summary judgment, and during a telephone conference on September 29, 2014, Zurich's counsel stated, "So, Your Honor, again, while we would like to rely upon this three years' provision within the policy, I don't think we can do that."  <u>See</u> Tr. Sept. 29, 2014 at 7:14-8:17.  The court offers no opinion on that conclusion.  <u>See</u> W. Va. Code § 33-15-4(k) (requiring accident and sickness policies to include a provision barring suit "after the expiration of three years after the first written proof of loss is required to be furnished").

good faith settlement of [his] claims, compelled [him] to
initiate litigation in order to secure disability benefits,
failed to settle [his] claim when disability was made evident,
and failed to provide [him] with reasonable explanations for"
denying the claim.  Id. ¶ 17.

As a result, O'Dell asserts that Zurich's decision to
deny his claim for disability benefits was "arbitrary,
capricious, unreasonable, and not made in good faith, all as the
result of a conflict of interest."  Id. ¶ 20.  Alternatively, he
maintains that the "denial was based on the clearly erroneous
finding by Zurich that he had not provided medical evidence
showing [that] he remained disabled under the [Policy's]
definition of disability[.]"  Id. ¶ 22.  The complaint seeks
"judgment against the defendant for current and future medical
expenses, and other long term disability benefits due [to
O'Dell,] . . . prejudgment interest, post judgment interest,
court costs, attorneys fees," and damages "for aggravation,
inconvenience, embarrassment, [and] humiliation."  Id. at
Prayer.

The pending cross-motions for summary judgment
followed.  "When faced with cross-motions for summary judgment,
the court must review each motion separately on its own merits
to determine whether either of the parties deserves judgment as

18

a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted).  A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## II. Applicable Standards

### A.

The court first determines the appropriate standard of review.  Blackshear v. Reliance Std. Life Ins. Co., 509 F.3d 634, 638 (4th Cir. 2007) ("In reviewing the denial of benefits under an ERISA plan, a court's first task is to consider de novo whether the relevant plan documents confer discretionary authority on the plan administrator to make a benefits-eligibility determination.").  "[A] denial of benefits challenged under § 1132(a)(1)(B) [of ERISA] is to be reviewed under a de novo standard unless the benefit plan gave the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

19

_Firestone Tire & Rubber Co. v. Bruch_, 489 U.S. 101, 115 (1989). If the administrator or fiduciary is vested with discretionary authority by the plan, then the proper standard of review is much narrower, and asks only whether the administrator or fiduciary abused that discretion.  _Id._  The parties dispute the applicable standard.  O'Dell asserts that the ordinary de novo standard applies.  Zurich contends that its decision to deny O'Dell's claim should be reviewed under an abuse of discretion standard.

Zurich argues that abuse of discretion is the proper standard because O'Dell has provided "no explanation as to why the _de novo_ standard of review should apply," and "no explanation as to why the abuse of discretion standard should not be utilized."  Defendant's Response to Plaintiff's Motion for Summary Judgment ("Def.'s Resp.") at 2.  Zurich has it backwards.  "_Firestone_ established that the default standard of review is de novo," not the other way around.  _Woods v. Prudential Ins. Co. of Am._, 528 F.3d 320, 322 (4th Cir. 2008).

Next, Zurich asserts that an abuse of discretion standard should apply because it denied O'Dell's claim after determining that his disability did not arise from an "injury," as defined by the Policy.  Def.'s Resp. at 3.  From those facts, Zurich extrapolates that it "clearly possessed the discretion to

20

determine eligibility for benefits under [the Policy] and to construe the terms of the same." Def.'s Resp. at 3. That argument misunderstands the quality of discretion that must be afforded a plan administrator in order for an abuse of discretion standard to attach.

"[A]n ERISA plan can confer discretion on its administrator . . . (1) by language which 'expressly creates discretionary authority,' and (2) by terms which 'create discretion by implication.'" Woods, 528 F.3d at 322 (quoting Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522-23 (4th Cir. 2000)). Though it never says so directly, Zurich appears to argue that it had implicit discretionary authority because it had the power to determine whether O'Dell was entitled to recover under the Policy. But the fact that Zurich had the authority to deny O'Dell's claim is not enough, because "discretionary authority is not conferred 'by the mere fact that a plan requires a determination of eligibility or entitlement by the administrator.'" Id. at 323 (quoting Gallagher v. Reliance Std. Life Ins. Co., 305 F.3d 264, 269 (4th Cir. 2002)). "[A]lmost all ERISA plans designate an administrator who, in order to carry out its duties under the plan, must determine whether a participant is eligible for benefits." Id. As our court of appeals has explained, the "authority to make

21

determinations does not carry with it the requisite discretion . . . unless the plan so provides." Id. (emphasis added). In other words, absent some additional policy language, a plan "which simply conveys authority to an administrator" to determine benefits eligibility "creates the expectation only that such authority will be exercised, not that the administrator will enjoy wide discretion in wielding its authority as well as freedom from searching judicial scrutiny." Id.

Zurich has failed to point to any language in the Policy that confers the requisite discretion. Accordingly, Zurich's decision to deny O'Dell's claim is subject to de novo review.

### B.

In addition to the standard of review, several general principles guide the analysis of ERISA benefits claims. To begin with, the scope of the court's review is limited to the reasons for denying coverage stated by Zurich during the administrative process. See Thompson v. Life Ins. Co. of N. Am., 30 F. App'x 160, 163-64 (4th Cir. 2002) ("A court may not consider a new reason for claim denial offered for the first time on judicial review."); Hall v. Met. Life Ins. Co., 259 F.

App'x 589, 593 (4th Cir. 2007) ("The statutory and regulatory text and the case law demand that judicial review take into account only reasons for an adverse benefits determination offered in the initial denial notice, because those are the only rationales on which a claimant might have arguably been given a 'full and fair' opportunity to respond during the administrative process."); Ferguson v. United of Omaha Life Ins. Co., 3 F. Supp. 3d 474, 489 (D. Md. 2014).

Within that context, O'Dell has the burden of demonstrating that he is entitled to benefits, Ruttenberg v. U.S. Life Ins. Co., 413 F.3d 652, 663 (7th Cir. 2005); see Stanford v. Continental Cas. Co., 514 F.3d 354, 364 (4th Cir. 2008) (Wilkinson, J., dissenting) (quoting Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 270 (4th Cir. 2002), as providing that "claimants bear the burden of proving disability."). Zurich bears the countervailing burden of demonstrating that a policy exception or exclusion applies. See Jenkins v. Montgomery Indus., 77 F.3d 740, 743 (4th Cir. 1996); Ferguson, 3 F. Supp. 3d at 481; see also Am. States Ins. Co. v. Surbaugh, 745 S.E.2d 179, 185-86 (W. Va. 2013) ("With respect to general principles involved with examining provisions of an insurance policy, this Court has indicated that when an insurance company seeks to avoid its duty to defend, or its duty

23

to provide coverage, through the operation of a policy exclusion, the insurance company bears the burden of proving the facts necessary to trigger the operation of that exclusion." (internal quotation marks and citation omitted)).

The interpretation of the Policy is guided by federal common law, which is informed by ordinary principles of contract law and state common law.  Johnson v. Am. United Life Ins. Co., 716 F.3d 813, 819 (4th Cir. 2013).  Any ambiguities in the Policy documents are construed against Zurich, the drafter. Gallagher, 305 F.3d at 269.

### III. Zurich's Motion for Summary Judgment

With those general principles in mind, the court turns to Zurich's motion for summary judgment.  As noted, Zurich denied coverage on the basis of two different exclusions. First, because O'Dell did not provide timely proof of loss for his claim; and, second, because O'Dell's disability "was contributed to by several underlying medical conditions." Zurich bears the burden of demonstrating that those exclusions provided a proper basis for denying O'Dell's claim.

A.

The Policy's Proof of Loss provision, which Zurich
quoted in its denial letter, states:

> Proof of Loss. Written Proof of Loss must be sent to us
> within 90 days of the loss for all coverages except
> Weekly Income.  For Weekly Income, the Proof of Loss
> must be sent within 90 days of the last payment.  Failure
> to furnish the proof within such time shall neither
> invalidate nor reduce any claim if it was not reasonably
> possible to furnish the proof and the proof was furnished
> as soon as reasonably possible.

R. at 160.  Zurich denied O'Dell's claim, in part, because "the
first notice of [the claim] was received . . . on [May 14, 2003]
. . . for a loss [that] occurred on [September 29, 1999]," and
"[n]o reason for late notice was provided."  R. at 148; see also
Def.'s Mem. at 5-11 (reiterating that position).  That raises
two questions:  First, was O'Dell's proof actually untimely?
Second, if so, was his untimely filing a proper ground for
denying his claim?

1.

a.

Regarding the first question, the Policy states that
"[w]ritten [p]roof of [l]oss must be sent to [Zurich] within 90
days of the loss . . . . [unless] it was not reasonably possible
to furnish the proof and the proof was furnished as soon as
reasonably possible."  R. at 160.  As noted, the Policy
contemplates that written proof of loss may be submitted on a

25

Claim/Proof of Loss form provided by Zurich, or in a detailed written report from the insured.  As for the timing of that submission, it is clear that the triggering event for the provision's ninety-day requirement is the claimed "loss"; however, the Policy provides no useful definition of "loss."[7]  In its denial letter, Zurich identified the date of O'Dell's loss as September 29, 1999 -- the date of his accident -- and argued that proof of loss was not timely because a completed claim form was not submitted until sometime in 2003, nearly three-and-a-half years later.  R. 148-49.  Zurich reiterates that position in support of its motion for summary judgment.  Def.'s Mem. at 7-8.

In Workman v. Continental Insurance Co., 538 F.2d 619 (4th Cir. 1976), the Fourth Circuit analyzed an insurance contract containing language nearly identical to the Policy at issue in this case.  There, as here, the policy defined a permanent and total disability as one "commencing within 180 days from the date of accident and continuing for twelve consecutive months, which shall prevent the insured person from engaging in any occupation or employment for which he is fitted

---

[7] The Policy defines "loss" to include actual severance of a hand, foot, thumb, or index finger; or a total and permanent loss of sight, speech, or hearing.  R. at 159.  None of those injuries are at issue here.

26

by reason of education, training and experience for the
remainder of his life." Id. at 620; accord R. at 165 (language
from the Policy providing coverage "[i]n the event a Covered
Person is totally disabled as the result of an injury, within
180 days of an accident, so as to be unable to engage in his own
occupation, and if (a) he remains so disabled for a period of 12
consecutive months and (b) at the end of such 12 month period he
is totally and permanently disabled so as to be unable, for the
remainder of his life, to engage in any occupation or employment
for which he is reasonably qualified by training, education or
experience[.]").  The Workman policy also required notice of a
claim to "be given to the Company within thirty days after the
occurrence or commencement of any loss covered by the policy, or
as soon thereafter as [was] reasonably possible," 538 F.2d at
620, and, like the Policy at issue here, provided no relevant
definition of "loss."

        Construing the language of the Workman policy, our
court of appeals concluded that, "when related to [a] claim for
permanent total disability," the notice provision "plainly" did
not begin to run from the date of the accident.  Id.  Rather,
because "[t]he loss [was] the permanent total disability," the
notice period could only begin to run after the expiration of
the twelve month period of continuous disability set forth in

27

the plan's definition of "permanent total disability."  Id. at 621-22; see also Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 215 F.3d 516, 524-25 (5th Cir. 2000) (construing proof of loss provision to run from the end of a contractually required twelve-month period of disability).

Zurich cites and discusses Workman, but argues that it was nevertheless correct to identify the accident date as O'Dell's date of "loss" inasmuch as the Policy "contains no . . . definition of permanent total disability" analogous to that found in Workman.  Def.'s Mem. at 7-8.  That is simply not the case.[8]  As noted, the definition of permanent total disability found in the Workman plan and the definition in the Policy are nearly identical in their language, and practically identical in their requirements.  Both temporally define a total disability as one arising within 180 days of an accident and continuing for an uninterrupted interval of twelve months.  Both also substantively describe a permanent and total disability as one that prevents the insured from resuming any occupation for which

_____

[8] It is true that the Policy elsewhere defines "Total Disability" as a "total and continuous disability that prevents a Covered Person from performing all duties required by his or her job." R. at 159.  That is not, however, the language that Zurich quoted in its March 16, 2004 letter denying O'Dell's claim. Rather, as noted, the denial letter fully set forth the definition of permanent total disability quoted and discussed above.  See R. at 148.

28

he is qualified by education, training, or experience.  Given
these striking similarities, there appears to be no reason why
the Policy's Proof of Loss provision should not also be
interpreted to run from a date twelve months after O'Dell's
disability first arose.

There is no dispute that O'Dell did not return to work
following his accident, so his proof of loss would have been
timely if it had been submitted on or before December 28, 2000
-- one year and ninety days after his disability arose on
September 29, 1999.  As noted, O'Dell did not submit a claim
form to Zurich until sometime in 2003, well after that deadline.

b.

O'Dell did not respond to Zurich's motion for summary
judgment, but his own cross-motion offers three reasons why his
proof of loss was timely.  None is persuasive.

First, O'Dell argues that he complied with the Notice
provision of the Policy on the basis of the Certification Form
dated January 31, 2000.  See Pl.'s Mem. at 5 (quoting the
Policy's Notice provision and arguing that, "at the very latest,
the [d]efendant had notice by February 22, 2000 when, by its
signature, [it] waived premium payments for th[e] policy.").
Zurich disputes that the Certification Form satisfied the Notice

29

provision.  Def.'s Resp. at 4-6.  But whether it did or not is
irrelevant for present purposes, as Zurich has not suggested
that it is entitled to summary judgment on the basis of the
Notice provision.  Rather, as noted, Zurich invoked and quoted
the Proof of Loss provision in its letter denying O'Dell's
claim, R. at 148-49, and now argues, irrespective of the Notice
provision, that O'Dell was "still required to comply with the
written proof of loss requirement," Def.'s Resp. at 6.

        Next, O'Dell notes that "despite having notice by
February 22, 2000, at the very latest, there is no indication
that [Zurich sent] any claim forms . . . to [O'Dell] until
2003," suggesting that his late submission was excused by
Zurich's failure to provide the relevant forms.  Pl.'s Mem. at
5.  In response, Zurich aptly maintains that, if O'Dell did not
receive claim forms after providing notice, the Policy entitled
him to -- but he did not -- "submit a detailed written report of
the claim and the extent of his loss," which Zurich "would have
accepted the same as a Proof of Loss assuming it was sent
within" the relevant time period.  Def.'s Resp. at 7.  O'Dell
does not contend that he submitted such a report, or point to
any evidence in the record indicating that such a report was
submitted, so his failure to remit timely proof of loss cannot
be excused on that basis.

Finally, O'Dell argues that his "notice" -- presumably he means his 2003 claim form -- "was timely" because his claim is for Weekly Income benefits, and "the notice period has [therefore] not expired" because "no payments have been made." Pl.'s Mem. at 5.  As noted, the Proof of Loss provision generally provides that written proof of loss "must be sent to Zurich within [ninety] days of the loss," but "[f]or Weekly Income [claims], the Proof of Loss must be sent within [ninety] days of the last payment."  R. at 160.  As Zurich points out, however, "there is nothing to suggest that [O'Dell] ever made a request for Weekly Income."  Def.'s Resp. at 8.  And, as discussed above, the Policy does not appear to provide Weekly Income coverage for O'Dell inasmuch as that category of benefits is marked "None" on the first page of the Policy.  See R. at 157 (indicating that Weekly Income coverage is not provided).

Indeed, Zurich's denial letter dated March 16, 2004 states that "Accidental Death benefits [we]re denied," R. at 148, and quotes the coverage language found under the Policy's provisions for Permanent and Total Disability benefits, id. (quoting R. at 174).  Zurich's correspondence with O'Dell's medical providers also consistently refers to the claim as one for "Permanent Total Disability [] benefits" or "Accidental Death benefits."  E.g., R. at 136-37.  The Certification Form

31

completed by AEP and the enrollment records attached thereto likewise indicate that O'Dell elected "Optional Accidental Death & Dismemberment" coverage, and makes no mention of "Weekly Income." R. at 60-62. O'Dell has not pointed to countervailing evidence in the record that suggests his claim arose under the Policy's Weekly Income provisions. Consequently, it appears that his reliance on the Proof of Loss provision's timing requirements for Weekly Income coverage is misplaced.

In sum, the terms of the Policy required O'Dell to submit proof of loss to Zurich by December 28, 2000. As a result, because O'Dell did not send a Claim/Proof of Loss form or a detailed report of his loss to Zurich until sometime in 2003, he did not submit timely proof of loss.

### 2.

The remaining question as to timeliness is whether O'Dell's failure to submit timely proof of loss was a valid basis for denying his claim. The Proof of Loss provision states that "[w]ritten [p]roof of [l]oss must be sent to [Zurich] within [ninety] days of the loss for all coverages[.]" R. at 160 (emphasis added). It then explains that "[f]ailure to furnish [proof of loss] within the specified time frame shall neither invalidate nor reduce any claim if it was not reasonably

32

possible to furnish the proof and the proof was furnished as soon as reasonably possible." Id.  Although this latter provision does not say so explicitly, the negative implication of the quoted language is that the failure to provide timely proof of loss would invalidate or reduce a claim unless the specified exception was applicable.  Moreover, the language immediately following the Proof of Loss provision states that claims for all losses would be paid "immediately upon receipt of written Proof of Loss," id., again indicating that the submission of proof of loss as defined by the Policy is a prerequisite to recovery.  Read together, those provisions indicate that timely submission of proof of loss is a condition precedent to recovery under the Policy.  See Cisneros v. UNUM Life Ins. Co. of Am., 134 F.3d 939, 943 (9th Cir. 1998) (holding that plan language providing a time limit for submission of proof of loss, coupled with language stating that benefits would be paid "[w]hen the company receive[d] proof," made timely submission of proof of loss a condition precedent to recovery); Baptist Mem'l Hosp. v. Marsaw, 13 F. Supp. 2d 696, 702 (W.D. Tenn. 1998) ("The SPD defines the conditions precedent for the receipt of Fund benefits, and the requirement that proof of loss 'must be furnished to the Fund Office' within one year of the loss 'logically and unambiguously establish[es] that, under the [SPD], timely submission of proof is a condition precedent to

the payment of benefits.'"), aff'd sub nom. Baptist Mem'l Hosp.
v. Marsaw, 208 F.3d 212 (6th Cir. 2000); see also UNUM Life Ins.
Co. of Am. v. Ward, 526 U.S. 358, 369 (1999) ("Insurance
policies . . . frame timely notice provisions as conditions
precedent to be satisfied by the insured before an insurer's
contractual obligation arises.")

There are, however, instances in which there is reason
to conclude that a proof of loss provision should not be
strictly applied.  State insurance law principles, for instance,
often mitigate the potentially harsh consequences of failing to
comply with notice and proof of loss requirements.  Though the
precise formulations vary from state to state, these so-called
"notice-prejudice" rules require an insurer seeking to avoid
liability for an untimely claim to demonstrate some prejudice
arising from the insured's failure to comply with the provisions
of the policy.  And the Supreme Court has specifically held that
an ERISA-governed plan can "be interpreted in light of state
insurance rules" that are not otherwise preempted, CIGNA Corp.
v. Amara, 131 S. Ct. 1866, 1877 (2011), including "notice-
prejudice" rules that "govern[] whether or not an insurance
company must cover claims submitted late," Kentucky Ass'n of
Health Plans, Inc. v. Miller, 538 U.S. 329, 339 n.3 (2003); see
also Ward, 526 U.S. at 367-73 (confirming that California's

34

notice-prejudice rule is not preempted by ERISA because it is a law "regulating insurance").

In West Virginia, "[t]he satisfaction of a notice provision . . . is a condition precedent to coverage for the policyholder," Colonial Ins. Co. v. Barrett, 542 S.E.2d 869, 874 (W. Va. 2000), and "furnishing a proof of claim when required as a condition in an insurance policy[] is a condition precedent to recovery under the policy," Petrice v. F. Kemper Ins. Co., 260 S.E.2d 276, 278 (W. Va. 1979). But "notice provision[s] -- also called proof of loss provision[s] -- 'are . . . liberally construed in favor of the insured,'" and not "read as a series of technical hurdles." Barrett, 542 S.E.2d at 874 (quoting Petrice, 260 S.E.2d at 278). "Rather, a 'substantial compliance,' . . . 'resulting in the insurer being afforded an adequate opportunity to investigate the claim and formulate an estimate of its liabilities, is all that is required.'" Barrett, 542 S.E.2d at 874 (discussing notice provisions (quoting Petrice, 260 S.E.2d at 278 (discussing proof of loss provisions)).

Where, as here, the insured has failed to strictly comply with the timing requirements of a policy, one looks to the "length of delay in notifying the insurer," as well as "the reasonableness of the delay" in assessing whether there has been

substantial compliance.  Barrett, 542 S.E.2d at 875 (quoting
Syl. Pt. 2, Dairyland Ins. Co. v. Voshel, 428 S.E.2d 542, 546
(W. Va. 1993)).  "If the delay appears reasonable in light of
the insured's explanation, the burden shifts to the insurance
company to show that the delay in notification prejudiced their
investigation and defense of the claim."  Syl. Pt. 2, Barrett,
542 S.E.2d at 707 (quoting Syl. Pt. 2, Voshel, 428 S.E.2d at
543)).  "If the insurer can produce evidence of prejudice, then
the insured will be held to the letter of the policy . . . and
barred from making a claim against the insurance company."  Id.
"If, however, the insurer cannot point to any prejudice caused
by the delay in notification, then the claim is not barred by
the insured's failure to notify."  Id.

          As he explained in his appeal letter, O'Dell submitted
his claim to Zurich late for two reasons:  he was unaware of his
coverage under the Zurich Policy; and it took some time to
ascertain where and how he was to submit his claim.  In
addition, as earlier noted, Zurich executed a waiver of premium
on February 22, 2000, pursuant to the terms of the Policy that
makes the waiver benefit available when a "Covered Person
becomes totally disabled and is eligible for benefits under the
Policyholder sponsored Long Term Disability Program."  The

waiver appears to have remained in effect, putting Zurich on notice that O'Dell may have a claim under the Policy.

On the other hand, Zurich has pointed to no evidence that its investigation of O'Dell's claim was prejudiced in any way by the timing of his filing. Indeed, although he submitted it late, O'Dell ultimately filed his claim on Zurich's preferred form; Zurich (with O'Dell's assistance) was able to obtain and review the police report of O'Dell's accident, his hospital records, and his outpatient treatment records spanning several years; and the collected material provided a sufficient basis for Zurich's medical expert to review the claim and opine on the cause of O'Dell's symptoms. It is unclear what additional information, if any, Zurich could have obtained if O'Dell had submitted his proof of loss in 2000 rather than 2003. In fact, by virtue of the delay, Zurich received more medical records and a longer longitudinal picture of O'Dell's treatment and symptoms. In any case, it appears that Zurich was more than "able to adequately investigate the claim and estimate its liabilities," and that is "all that is required." Petrice, 260 S.E.2d at 278; cf. Bogusewski v. Life Ins. Co. of N. Am., 977 F. Supp. 1357, 13660, 1362 (E.D. Wisc. 1997) (holding that proof of loss submitted four years late did not bar plaintiff's claim

under similar notice-prejudice rule where the insurer presented no evidence of prejudice).

Accordingly, and in the absence of any evidence or argument from Zurich that O'Dell's untimely proof of loss prejudiced its investigation, the court concludes that O'Dell's failure to strictly comply with the Proof of Loss provision was not a valid basis for denying his claim.

B.

Zurich's alternative basis for denying coverage was the Policy provision that excluded coverage for losses "caused by, contributed to[,] or result[ing] from: . . . e. Illness or disease," rather than "an accident, direct and independent of all other causes." It is important to emphasize the limited nature of that conclusion. Zurich did not determine that O'Dell's injuries and symptoms weren't disabling. Indeed, the denial letter specified that "the disability was contributed to by several underlying medical conditions[.]"  R. at 148 (emphasis added).

Testing that proposition requires a more thorough understanding of O'Dell's medical history and Zurich's decision.

1.

As noted, O'Dell was involved in a motor vehicle accident while on his way to work on September 29, 1999.  Joint Stip. ¶ 4.  He was knocked unconscious for approximately forty-five minutes after the accident, Joint Stip. ¶ 5, and transported from the scene to Pleasant Valley Hospital where he was admitted for treatment, R. at 16.  At the hospital, treating physicians found him "very alert and coherent," but noted that he complained "of left chest and left shoulder pain."  R. at 21. X rays were negative for cervical spine fractures or dislocations, but did reveal "at least [five] left rib fractures and one right rib fracture," as well as a fractured left clavicle.  R. at 20-22.  A CT-Scan showed "a very questionable small" amount of cranial bleeding.  R. at 22.  After being examined at Pleasant Valley Hospital, O'Dell was transferred in "clinically stable" condition to Charleston Area Medical Center ("CAMC") on September 29, 1999.  R. at 20.

Chest X rays taken at CAMC confirmed fractures of O'Dell's left clavicle and left ribs, and showed indications of an "old fracture of the right third rib."  R. at 40.

39

Examination of the thoracic spine revealed "degenerative changes with no evidence of any fracture," while "spondylolisthesis[9] [was] present at multiple levels."  Id.  O'Dell's lumbar spine showed "some narrowing of the L3-4 disk space with an old compression fracture of the inferior plate of [the] L2" vertebrae.  Id.  A follow-up CT-Scan revealed no indication of intracranial bleeding.  Id.  O'Dell was discharged from CAMC, after three days, on October 3, 1999.

Following his discharge, O'Dell sought outpatient treatment from a number of physicians.  The record indicates that O'Dell was initially examined by Dr. George S. Zakaib at Valley Orthopaedic Surgeons, PLLC ("Valley Orthopaedic") in Charleston, West Virginia, throughout the fall and winter of 1999.  On October 11, 1999, O'Dell complained to Dr. Zakaib of "multiple aches and pains throughout the back and legs and shoulders and ribs."  R. at 38.  Physical examination at that time revealed, among other things, "[d]orsal lumbar flexion to 40[%] with associated pain," as well as bruising of the lower left extremity.  Id.  Dr. Zakaib's treatment records also noted

---

[9] Spondylolisthesis is a "forward displacement or slipping of one of the bony segments of the spine (i.e., of a vertebra) over its fellow below, but usually the slipping of the fifth or last lumbar (loin) vertebra over the body of the sacrum[.]" Attorneys' Dictionary of Medicine, Schmidt, S-262 (10/2010) (vol. 5 2014).

O'Dell's recently sustained left clavicle fracture and multiple rib fractures, as well as an "[o]ld vertebral fracture, [and an] acute lumbar sprain."  Id.

Approximately one month later, on November 3, 1999, O'Dell returned to Valley Orthopaedic complaining of "[m]ultiple musculoskeletal aches," "left sided neck pain and stiffness[,]" [n]umbness in the right ring and small fingers and ulnar border of [the] right hand[,]" "low back pain in the region of the old fracture with radiation down the legs[,]" and dizziness.  R. at 39.  As a result of his symptoms, O'Dell stated that he was "not able to return to work" at that time.  Id.  Dr. Zakaib recommended that O'Dell "see a neurologist for dizziness . . . and [a] neurosurge[on] for low back pain[.]"  Id.  O'Dell made a final visit to Valley Orthopaedic on December 15, 1999.  The record indicates that his left clavicle fracture had healed by that time, and Dr. Zakaib recommended that O'Dell be discontinued from further care, noting that any "[f]urther disability" was "likely related to back and sarcoidosis."  Id.

Around the same time, on December 13, 1999, O'Dell sought treatment at Neurological Associates, Inc. from Dr. Frederick H. Armbrust, a neurosurgeon to whom he had been referred by Dr. Zakaib.  R. at 45.  Dr. Armbrust noted that O'Dell had been referred "because of persistent problems with

back pain . . . associated with a feeling of numbness and
discomfort involving the lower extremities" that was worse on
the left side.  Id.  Treatment notes from the initial visit
reflect that Dr. Armbrust had treated O'Dell "on two previous
occasions for problems related to low back pain in the summer of
1994," but O'Dell "was treated conservatively" on those
occasions, "improved[,] and had no further residual problem."
Id.  During his examination, Dr. Armbrust reviewed X rays dated
October 1, 1999, including "lumbar spine [X rays] which
demonstrate[d] degenerative changes or old traumatic changes in
the mid-lumbar region as previously described in [Dr.
Armbrust's] note of August of 1994."  R. at 46.  He opined that
O'Dell was suffering from "probable post-concussional syndrome,
cervical strain, and low back strain[,]" and recommended "a
lumbar MRI scan," prior to a "return for follow-up" treatment.
Id.

        Thereafter, an MRI of the lumbar spine was conducted
at CAMC on December 27, 1999.  "Axial and sagittal images . . .
were obtained," and revealed the following:

- "Normal alignment of the lumbar spine."

- "[N]arrowing of the disc spaces from L1 through L5."

- "L1-2 disc space [was] remarkable for a diffuse disc
  protrusion greatest in the right paracentral region."

- "The L1-2 level demonstrate[d] no evidence [of] significant disc protrusion or disc herniation."

- "The L3-4 disc space level [was] remarkable for diffuse disc protrusion[, which] in combination with hypertrophied ligamentum flavum and hypertrophied facet joints[,] produce[d] moderate to severe spinal stenosis."

- "The L4-5 level [was] remarkable for a mild bulging annulus fibrosus . . . in combination with hypertrophied facet joints[, which] produce[d] mild spinal stenosis and moderate to severe neural foraminal stenosis bilaterally."

- "The L5-S1 level [was] remarkable for a central/left paracentral disc protrusion without impingement upon the lumbar thecal sac or left S1 nerve root."

R. at 48-49.  Based on those images, Dr. Stephen Elksnis diagnosed O'Dell with "[m]oderate to severe spinal stenosis[10] at the L3-4 level[,] . . . mild spinal stenosis at the L4-5 level[,] . . . moderate to severe neural foraminal narrowing at the L3-4 and L4-5 levels[, and] . . . a diffuse disc protrusion at the L1-2 level[.]"  R. at 49.

Dr. Zakaib also referred O'Dell to a neurologist, Dr. Kuruvilla John at Kanawha Valley Neurology, Inc., from whom O'Dell sought treatment regarding his complaints of dizziness. R. at 50.  On December 29, 1999, he presented with "numbness of

---

[10] Stenosis is the "abnormal narrowing of a body passage, opening, canal, or duct . . . usually due to an overgrowth or shrinkage of the tissue around it[.]"  Attorneys' Dictionary of Medicine, Schmidt, S-292 (9/2014) (vol. 5 2014).

the fourth and fifth fingers on the right side, numbness of the left big toe, neck and back pain[,] and severe dizziness" accompanied by a "spinning sensation." Id. Following a physical examination, Dr. John opined that O'Dell was suffering from "post-concussion vestibular dysfunction[,] . . . similar to benign positional vertigo[.]"[11] R. at 51. He advised O'Dell that the post-concussion symptoms would resolve gradually over a period of time, and "arranged for nerve conduction studies" to assess O'Dell's complaints of numbness in his right hand. Id.

After obtaining the MRI of his lumbar spine and consulting with Dr. John, O'Dell returned to see Dr. Armbrust on January 10, 2000. R. at 52. Upon physical examination, O'Dell

---

[11] "In non-sport-related concussion, most individuals recover completely within the first 3 months; however, up to 33% may exhibit symptoms beyond that." John J. Leddy, et al., Rehabilitation of Concussion and Post-concussion Syndrome, 4 Sports Health 147, 147 (2012) (footnotes omitted), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3435903 /pdf/10.1177_1941738111433673.pdf. The persistence of symptoms, including headache and dizziness, beyond that point "may herald the development of post-concussion syndrome." Id. "Vestibular dysfunction is commonly associated with [traumatic brain injury]," and is a symptom of post-concussion syndrome that may be linked to dizziness and sensations of vertigo. Id. at 148, 150.

Benign positional vertigo is caused by a disruption in the inner ear. See Benign positional vertigo, U.S. Nat'l Library of Medicine, http://www.nlm.nih.gov/medlineplus/ency/art arti/001420.htm. Symptoms include spinning sensations, loss of balance, nausea and vomiting, hearing loss, and vision problems. Id. The condition can be treated, but "may come back again without warning." Id.

was "in no distress[,]" his "[r]ange of motion of the back was
mildly limited in all directions[,]" and he "move[d] extremely
slowly." Id.  After reviewing the MRI images, Dr. Armbrust
indicated that O'Dell's "[b]ack and bilateral leg pain [was]
possibly related to lumbar stenosis with superimposed focal disc
protrusion at L3-4," and recommended that O'Dell follow up with
him in approximately three weeks.  R. at 52-53.

        O'Dell returned on February 17, 2000.  R. at 64.  He
"appear[ed] quite tense during examination and . . . grimace[d]
with pain in conjunction with any movements of the lower
extremities[.]" Id.  Dr. Armbrust reviewed O'Dell's previous
MRI scan, as well as additional, more recently performed, MRI
scans ordered by Dr. John.  Id.  The scans revealed "a moderate
degree of spinal stenosis" and spondylosis, but Dr. Armbrust was
ultimately "unable to explain [O'Dell's] complaints on the basis
of surgically correctible disease." Id.  He explained that
surgical intervention was not appropriate, and recommended a
"continued conservative approach[.]" Id.

        Roughly three months later, on May 22, 2000, O'Dell
sought treatment from Dr. Jimmy W. Adams at the Huntington Spine
Rehab & Pain Center ("Huntington Spine").  R. at 67.  Dr. Adams
noted that O'Dell "appear[ed] uncomfortable" and "seem[ed] to
have difficulty finding a comfortable position."  R. at 68.  He

45

observed that O'Dell had "diffuse palpatory tenderness in the
entire posterior paracervical region," as well as "intense
palpatory tenderness over the greater and lesser occipital
nerves"; he indicated that "O'Dell grimace[d] and pull[ed] away
in discomfort" when "th[o]se areas [were] palpated[.]"  R. at
69.  Dr. Adams also noted that "Mr. O'Dell did show signs of
instability as he moved about grasping objects to steady
himself.  He did at these times report feeling unsteady."  Id.
Additional examination and diagnostic testing revealed that
O'Dell's "intrinsic muscles of the cervical and lumbar spine
ha[d] . . . reacted to . . . arthropathy[12] by guarding and
splinting to the point that they ha[d] lost their functional
[range of motion] and [had] become functionally useless due to
extensive . . . atrophy," resulting in "considerable cervical
and lumbar weakness" and reduced range of motion.  R. at 70.

Dr. Adams opined that O'Dell was suffering from, among
other things, vertigo, degenerative disc disease of the lumbar
spine, degenerative joint disease of the lumbar spine, carpal
tunnel syndrome "on the right," and "[s]ignificant weakness and
deconditioning along with decreased range of motion involving

---

[12] Arthropathy is a general term that refers to any "disease of a
joint or of joints."  Attorneys' Dictionary of Medicine,
Schmidt, A-542 (10/2012) (vol. 1 2014).

the cervical and lumbar spine." <u>Id.</u>  He indicated that
"underlying pathology" had "contributed greatly to [O'Dell's]
lack of functional rehabilitation progress, recommended a course
of treatment designed to strengthen the spine, and advised
O'Dell to return in two weeks for a follow-up visit.  R. at 70-
71.

        Following that initial visit, the record indicates
that Dr. Adams treated O'Dell on a regular basis until December
of 2003.[13]  During that time, O'Dell consistently presented with
chronic vertigo and dizziness, headaches, pain and stiffness in
the neck, low back pain, numbness and tingling in his lower
extremities, and numbness in the little- and ring-finger of his
right hand.  <u>See, e.g.</u>, R. at 72, 76, 78-79, 80, 82, 84, 86, 89,
91, 93, 95, 97, 100, 102, 104, 118.  With respect to his chronic
vertigo and neck pain, Dr. Adams observed the following
symptoms, consistently, during visits between June of 2000 and
December of 2003:

- June 5, 2000: "When Mr. O'Dell transfers from the
  chair to the exam table he has to stop to get his
  balance.  He reports some dizziness and vertigo which

---

[13] The record contains treatment notes from June 5, 2000, June
26, 2000, August 3, 2000, August 31, 2000, November 6, 2000,
December 14, 2000, February 8, 2001, April 5, 2001, May 31,
2001, August 23, 2001, October 18, 2001, February 5, 2002,
September 1, 2002, December 10, 2002, March 10, 2003, May 27,
2003, July 1, 2003, July 28, 2003, August 28, 2003, and December
5, 2003.

seems to abate somewhat when he stands still." R. at 72

- June 26, 2000: "[H]e is still having problems with dizziness that he says comes and goes. He mentions that at times when he stands from a sitting position this comes on.  He mentions that otherwise at times he says that he is just walking along and the wave of dizziness may occur." R. at 74

- August 3, 2000: O'Dell appeared "unsteady on his feet" due to his chronic dizziness.  R. at 76

- August 31, 2000: "Mr. O'Dell mentions that he is still having some vertigo.  He doesn't drive except for very short distances back home.  He is still having pain in the neck." R. at 78.

- October 4, 2000: O'Dell mentions "that he stumbled because of one of his 'dizzy spells,'" and reports "some stiffness in his neck[.]" R. at 80.

- December 14, 2000: "Mr. O'Dell reports that he still has problems with vertigo.  He mentions just recently he was with some friends, went to fall back and had a buddy grab him to prevent him from falling." R. at 84.

- February 8, 2001: O'Dell reports "that he is still suffering from vertigo," and "complains of pain and stiffness in his neck." R. at 86.

- August 23, 2001: "He continues to have vertigo with difficulty standing." R. at 93.

- October 18, 2001: "He tells me he's been having some pain in the left side of his neck down into his left shoulder and upper back region. . . . He reports continued vertigo." R. at 95.

- July 1, 2003: "Of course, he still has the chronic problems with vertigo and dizziness." R. at 124.

- December 5, 2003: "Mr. O'Dell tells me he is still having pain and stiffness in his neck and low back.

He also states he still has dizziness and vertigo quite often." R. at 141.

O'Dell also consistently reported back and leg pain during that period, which Dr. Adams observed as follows:

- June 5, 2000: "In addition he reports continued low back pain with numbness and tingling down into the left great toe." R. at 72.

- June 26, 2000: "He tells me that he is still having bilateral leg pain[.]" R. at 76.

- August 31, 2000: "He states that he is still having a lot of low back pain with pain and discomfort radiating into the back of his legs to the knees bilaterally. . . . [T]his pain seems to be worse when he is getting up or if he walks for any length of time." R. at 78.

- February 8, 2001: "He reports continued back pain and aching in both of his legs." R. at 86.

- October 18, 2001: "He reports continued low back pain with numbness and tingling down into the left foot." R. at 95.

- February 5, 2002: "Mr. O'Dell reports severe low back pain." R. at 97.

O'Dell stated that he did not have those symptoms prior to his accident, R. at 76, and expressed ongoing frustration with the extent to which his symptoms were affecting his ability to participate in day to day activities, see, e.g., R. at 78 (notes from August 31, 2000: "Mr. O'Dell became tearful during his visit today as he stated, 'It's awful when you have to depend on someone to put your shoes on for you and you can't

49

do the things that you're used to doing.'"); R. at 82 (notes from November 6, 2000: "Mr. O'Dell . . . is very frustrated not to be able to do things that he has in the past done without having a lot of pain in his back."); R. at 89 (notes from April 5, 2001: "Mr. O'Dell mentions that he has increased pain with prolonged standing, sitting, squatting, stooping, bending, lifting, and twisting."); R. at 91 (notes from May 31, 2001: "Mr. O'Dell mentions that he still has a lot of trouble getting around due to diffuse physical pain and poor tolerance for physical activity."); R. at 93 (notes from August 23, 2001: "[O'Dell] mentions that recently he went on an outing with his family and was on his feet off and on all day. By the end of the day, he reports that he had a lot of pain in his left lower extremity. . . . Mr. O'Dell mentions that on this outing, [] he was not able to walk or keep up with the rest of the family[.]"). Although he reported having "good days and bad days," R. at 74, O'Dell also consistently complained that he was struggling with depression as a result of his symptoms. See, e.g., R. at 82; R. at 95 ("He reports he still feels depressed, although mentions Paxil seems to help."); R. at 97 ("Mr. O'Dell . . . confirm[s that] because of his pain, he simply feels very frustrated and depressed that he cannot do things that he would like to do.").

In March 2001, Dr. Adams stated that "Mr. O'Dell's condition [wa]s chronic," and remarked that he was not "very hopeful that [O'Dell] would be able to return to work."  R. at 88.  The next month, Dr. Adams stated that "Mr. O'Dell ha[d] a chronic pain syndrome which [wa]s related to injuries sustained in motor vehicle accidents."  R. at 90.  He added that O'Dell's injuries had "left him with poor tolerance for engagement in physical activities which would allow him to be gainfully employed," and concluded that "Mr. O'Dell [was] permanently disabled and unemployable for his previous occupation."  Id.  In May 2001, Dr. Adams reaffirmed that, by that time, there was "no way that Mr. O'Dell c[ould] return to his previous profession."  R. at 92.  He confirmed that conclusion again in October 2001, R. at 96, and in February 2002, R. at 99.  Finally, in December 2003, Dr. Adams once again stated that O'Dell was suffering from "[c]hronic vertigo/dizziness and depression[, and had p]oor tolerance for physical activity."  R. at 142.  He reiterated his opinion that O'Dell was "permanently and totally disabled," and added that "due to [O'Dell's] chronic vertigo and dizziness, [he] would be quite guarded in sending Mr. O'Dell to work."  Id.

2.

In its denial letter of March 16, 2014, Zurich devoted only two sentences to its decision to deny benefits on medical

51

grounds.  The first states that it had reviewed the disability
claim form, the police report of the accident, the attending
physician's statement, and the medical records of six doctors.
R. at 148.  The second sentence states the decision as follows:

> The result of our investigation does not evidence that
> the loss was the result of an accident, direct and
> independent of all other causes, but, in addition to the
> accident, that the disability was contributed to by
> several underlying medical conditions.

Id.  Apart from that conclusory assertion, the denial letter
offers nothing in the way of analysis or explanation.  It did
not, for example, explain which of O'Dell's injuries and
symptoms Zurich believed had been contributed to by underlying
conditions nor discuss the evidence that led Zurich to reach
that conclusion.

O'Dell appealed.  He maintained that he did not have
any of his current problems until his "unfortunate accident";
that he was able and working (indeed, on his way to work) before
the accident; and that his treating physicians linked his pain
and dizziness to the accident.  Indeed, he specifically noted
that he was still having problems with dizziness that was "a
direct result of [the] head and neck injury [he] received [from]
the car accident."  He also related that he "had worked for AEP
for [2.5] years[,] . . . 6 or 7 days a week, 9 hours, sometimes
more per shift," before the accident but suffered "drastic

52

changes to [his] health and lifestyle" thereafter that rendered him permanently and totally disabled.  Pl.'s Supp. Mem., Ex. B at 1-2.

The appeal prompted Zurich to refer O'Dell's file to Dr. Gerard Catanese with instructions to provide a medical opinion "as to whether the permanent total disability is the result of the accident direct and independent of all underlying medical conditions or whether the medical conditions contributed to the claimant's inability to work."  R. at 150-51.  After reviewing O'Dell's medical history, Dr. Catanese opined, "with in [sic] a reasonable degree of medical certainty[,] that Gregory O'Dell [sic] problems today are for the most part related to his pre-existing conditions and not the motor vehicle accident."  R. at 154.  He explained that conclusion as follows. First, Dr. Catanese opined that "O'Dell's back pain [wa]s for the most part due to his pre-existing spinal disease," because O'Dell had previously been treated by Dr. Armbrust for low back pain in 1994 and X rays and other diagnostic images taken after the accident "were negative for new injuries or fractures [to the spine], and [] showed only pre-existing spinal degenerative disease and an old fracture of [O'Dell's] lumbar spine."  R. at 153.  Second, Dr. Catanese observed that "all of [O'Dell's] described fractures from the motor vehicle accident [we]re on

the left side," and concluded that any numbness and tingling in his right hand possibly caused by carpal tunnel syndrome was "therefore . . . not traumatic." R. at 154. Finally, Dr. Catanese acknowledged that O'Dell had been treated for dizziness, but did not "see any proof" that the dizziness was "related to the accident." Id.

After reviewing Dr. Catanese's report, Zurich's ERISA Review Committee then "affirmed the denial" of O'Dell's claim "based upon the grounds in the denial letter dated March 16, 2004." R. at 156. The final denial letter did not expand on Zurich's rationale for denying benefits or offer any additional analysis; nor did it invite O'Dell to appeal.

3.

The Policy's exclusionary language coupled with the parties' divergent assessment of O'Dell's medical history raises an interpretive question with which "[c]ourts have long grappled[.]" Hall v. Met. Life Ins. Co., 259 F. App'x 589, 594 (4th Cir. 2007). Put simply, if a policyholder with an underlying condition is involved in an accident, when may the insurer deny coverage for a disability that is arguably attributable to the preexisting condition, the accident, or some combination of both?

54

Zurich suggests that the loss must be "solely caused by external and accidental means and [] not contributed to by any pre-existing conditions." Def.'s Resp. at 11 (citing Ray v. Fed. Ins. Co., No. 05-2507, 2007 WL 1377645, at *3-4 (E.D. Pa. May 10, 2007). In other words, Zurich urges, if an underlying condition played any role at all in causing the disability, coverage is excluded.

The Fourth Circuit has considered, but not adopted, that interpretive approach. In Adkins v. Reliance Standard Life Insurance Co., 917 F.2d 794, 796-97 (4th Cir. 1990), our court of appeals acknowledged, on one hand, the existence of caselaw such as Virginia's that would exclude coverage "if the [accidental] injury cooperated with a preexisting disease or bodily infirmity," or if the "noncovered risk" was any "but for" cause of the loss. Id. at 796 (citing Gay v. Am. Motorists Ins. co., 714 F.2d 13 (4th Cir. 1983) (construing Virginia law)). On the other hand, the court in Adkins observed that policyholders would "quite naturally [] apply a but for rule to the covered risk so that the triggering of a disabling condition by accident might authorize coverage whatever the previous condition might be." Id. at 797.

The court rejected both approaches, opting instead for a "middle ground" rule, applicable to ERISA-governed policies,

which it described as "neither all that the" policyholder would
prefer, "nor . . . as strict as the Virginia rule[.]"  Id.  As
the court explained:

> [A] pre-existing infirmity or disease is not to be
> considered as a cause unless it substantially
> contributed to the disability or loss. . . . [A] 'pre-
> disposition' or 'susceptibility' to injury, whether it
> results from congenital weakness or from previous
> illness or injury, does not necessarily amount to a
> substantial contributing cause. A mere 'relationship' of
> undetermined degree is not enough.

Id. at 797 (internal quotation marks and citations omitted).
Three years later, the Fourth Circuit clarified that the Adkins
rule required courts to conduct a two-step inquiry, asking:
(1) whether the insured had a pre-existing disease or a pre-
disposition or susceptibility to injury?; and (2) if so, whether
the pre-existing disease or the pre-disposition or
susceptibility to injury substantially contributed to the
disability or loss?  Quesinberry v. Life Ins. Co. of N. Am., 987
F.2d 1017, 1028 (4th Cir. 1993).[14]

---

[14] There is some question whether the Adkins test applies only to
a plan's requirement that covered loss result solely from an
accident, or whether it also governs the interpretation of
exclusionary clauses, like the one at issue here, that bar
coverage for losses caused by, resulting from, or contributed to
by illness or disease. Both were included in the plan in
Adkins, but the court noted that the latter "was not now at
issue[.]"  917 F.2d at 796.  Subsequent decisions seem to assume
that the analysis applies equally to both types of clauses.  See
Hall, 259 F. App'x at 591-92, 595 (applying Adkins in a case
where the plan excluded losses "contributed to or caused by"
disease, and where the insurer denied coverage because the loss
was not "solely and directly due to an accident" and on the

Regarding the first question, there can be no serious dispute about the fact that O'Dell suffered from one or more pre-existing conditions.  As the medical record makes clear, diagnostic images taken at the time of O'Dell's accident and examinations conducted in the months that followed revealed, at a minimum, a pre-existing vertebral fracture, moderate to severe spinal stenosis, spondylosis, and degenerative disc disease. E.g., R. at 69-70.  The critical question, then, is whether those pre-existing conditions were a "substantial" cause of O'Dell's disability.

The record supports the view that O'Dell's pre-existing conditions were a significant contributing cause of his back pain.  On one hand, it is true that O'Dell reported no debilitating back pain prior to his accident, that his previous occurrence of back pain in 1994 resolved with a conservative course of treatment, and that at least two of his treating physicians -- Dr. Armbrust and Dr. Zakaib -- diagnosed O'Dell with a post-accident lumbar strain.  But it's also true, as Dr. Catanese observed, that X rays and other diagnostic images taken after the accident "were negative for new injuries or fractures [to the spine], and [] showed only pre-existing spinal

---

basis of "the Plan's disease and physical impairment exclusions[.]").

degenerative disease and an old fracture of [O'Dell's] lumbar spine." R. at 153. Likewise, Dr. Armbrust suggested that O'Dell's "[b]ack and bilateral leg pain [was] possibly related to lumbar stenosis with" degenerative disc disease, R. at 52-53. And, perhaps most significantly, Dr. Adams -- who treated O'Dell extensively for several years -- similarly opined that O'Dell's lumbar weakness was the result of the "intrinsic muscles of the cervical and lumbar spine" "guarding and splinting" in reaction to "arthropathy" -- that is, disease.

The accident no doubt contributed to O'Dell's disabling back pain. It may even have triggered it. But the Fourth Circuit in Adkins rejected a rule that would allow recovery where a disabling condition was "triggered" by an accident "whatever the previous condition." 917 F.2d at 797. Nor is the fact that O'Dell had not complained of back pain since 1994 dispositive. In Hall v. Metropolitan Life Isnurance Co., the insured died of anaphylaxis after an accidental bee sting due to a previously undiagnosed bee-sting allergy. 259 F. App'x at 594-96. Despite the fact that the allergy had to that point been entirely dormant (indeed, unknown), our court of appeals concluded that it substantially contributed to the insured's death because it "ha[d] the potential to cause [the] severe anaphylactic reaction" that "was the immediate cause of

[] death."  Id. at 595.  Likewise, here, although O'Dell's
previous injury and degenerative conditions had not caused him
pain since 1994, they had the potential to do so.  And both Dr.
Adams and Dr. Armbrust respectively opined that O'Dell's pain
was possibly the result of atrophy, weakness, and decreased
range of motion caused by "arthropathy," R. at 70, or "lumbar
stenosis," R. at 52.

        Thus, while O'Dell's reported absence of back pain
prior to the 1999 accident is notable, the record fairly
reflects that he was suffering from one or more degenerative
spinal conditions; that he had previously, in 1994, been treated
for back pain; that diagnostic images taken immediately after
the accident showed no new injuries to the spine; and that at
least two of O'Dell's treating physicians linked his back pain,
leg pain, and lumbar weakness to some form of lumbar or spinal
disease.  That evidence suggests that his pre-existing
conditions contributed to his back pain.

        Yet that alone does not entirely justify Zurich's
decision to deny coverage.  As noted, O'Dell also claimed
benefits based on his vertigo or dizziness, R. at 107-09, and
it's hardly novel to assume that one accident may result in
multiple, discrete injuries, each capable of producing disabling
symptoms, cf. ITO Corp. of Baltimore v. Green, 185 F.3d 239,

242-43 (4th Cir. 1999) (upholding separate awards under the
Longshore and Harbor Workers' Compensation Act arising from
separate ankle and shoulder injuries suffered in the same
accident). Unlike O'Dell's back pain, there is no medical
evidence in the record to suggest that O'Dell's pre-existing
conditions played any role in producing his vertigo and
dizziness. Although Dr. Catanese did not find "any proof" that
O'Dell's dizziness was "related to the accident," the record
evidence directly refutes his conclusion. Dr. Armbrust
diagnosed O'Dell with a post-accident cervical strain, and he
and Dr. John both opined that O'Dell was suffering from some
form of post-concussion syndrome. R. at 46, 50-51. Dr. John
referred to it as "post-concussion vestibular dysfunction . . .
similar to benign positional vertigo." R. at 51. Dr. Adams
similarly diagnosed O'Dell with "traumatic brain injury," e.g.,
R. at 91, and "[a]pparent vertigo . . . which is post traumatic
in nature . . . possibly . . . caused by . . . sympathetic
traumatic imbalance attributed to trauma to the sympathetic
fibers that accompany the vertebral arteries during a trauma,"
R. at 70.

O'Dell consistently complained of dizziness and
stiffness and pain in his neck following his accident, see,
e.g., R. at 39, 50, 68, 76, 80, 86, 95, 141, and, unlike his

60

back pain, nothing in the record suggests that O'Dell previously exhibited those symptoms.  O'Dell's doctors repeatedly opined that those symptoms were the result of "trauma," and the parties have stipulated that O'Dell was knocked unconscious for approximately forty-five minutes during the accident, Joint Stip. ¶ 5.  All of that strongly suggests, particularly when viewed in the light most favorable to the plaintiff, that O'Dell's vertigo and/or chronic dizziness was caused solely by the accident, rather than any pre-existing injury or disease.

In its denial letter, Zurich never addressed whether O'Dell's vertigo and/or chronic dizziness, independent of his back pain, rendered him permanently and totally disabled within the meaning of the Policy.  Given that those symptoms appear to have been caused solely by injuries sustained in the accident, rather than any underlying condition, it was improper for Zurich to completely deny coverage without resolving that question. Accordingly, Zurich's motion for summary judgment upholding its denial of coverage must be denied.

### C.

There's at least one additional reason why the court cannot uphold Zurich's decision at this time.

"ERISA requires that every employee benefit plan 'provide adequate notice in writing to any participant or beneficiary whose claim for benefits . . . has been denied, setting forth the specific reasons for such denial.'" Gagliano v. Reliance Std. Life Ins. Co., 547 F.3d 230, 235 (4th Cir. 2008) (quoting 29 U.S.C. § 1133(1)).  And plan administrators must also "'afford a reasonable opportunity to any participant whose claims for benefits has been denied a full and fair review by the appropriate named fiduciary of the decision denying the claim.'"  Id. (quoting § 1133(2)).  A plan's procedures will "not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless," among other things, the claimant is provided with "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits[.]"  29 C.F.R. § 2560.503-1(h)(2)(iii).

Several circuit courts of appeal, including our own, have warned plan administrators to provide "specific reasons," rather than question-begging conclusions, to support their decisions.  See, e.g., Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F.2d 154, 158 (4th Cir. 1993) (emphasis in the original); Love v. Nat'l City Corp. Welfare Bens. Plan, 574 F.2d

392, 397-98 (7th Cir. 2009) ("As we have noted, [b]are
conclusions are not a rationale.  The Plan must provide a
reasonable explanation for its determination and must address
any reliable, contrary evidence presented by the claimant."
(alteration in the original; internal quotation marks and
citation omitted)); see also Sellers v. Zurich Am. Ins. Co., 615
F. Supp. 2d 816, 821-22 (E.D. Wisc. 2009) (holding that a "bare
unsupported conclusion" that did not "explain how [the plan
administrators] reached the[ir] conclusion" did not meet ERISA's
requirements).  In his complaint, O'Dell asserted that Zurich
failed to "provide [him] with reasonable explanations for"
denying his claim, Compl. ¶ 17, and though the parties devote no
argument to that proposition, the court is constrained to agree.

        As earlier noted, Zurich's initial denial letter did
nothing more than set forth the Policy's exclusionary language
and assert that it was applicable.  That's well short of what
ERISA requires.  "ERISA regulations elaborate" that "a denial
notice must contain" both "[r]eference to the specific plan
provisions on which the determination is based" and "[t]he
specific reason or reasons for the adverse determination".
Ellis v. Met. Life Ins. Co., 126 F.3d 228, 234 (4th Cir. 1997)
(quoting 29 C.F.R. § 2560.503-1(f)).  Plainly, then, quoting a
plan provision and simply concluding that it applies without

providing any rationale for that result, as Zurich did, is not enough.

Zurich's letter affirming the denial after appeal was also required to contain specific reasons, <u>Ellis</u>, 126 F.3d at 237, but instead provided an opaque explanation.  As discussed, Zurich invoked the Policy's proof of loss provision as a basis for denying O'Dell's claim, and O'Dell explained in his appeal his reasons for filing late.  What did Zurich make of his explanation?  The subject simply isn't addressed.  As for O'Dell's condition, the June 14 letter at least had the virtue of including a copy of Dr. Catanese's report, which casts some light on the reasons why Zurich believed O'Dell's claim was barred by the underlying condition exclusion.  But assuming that Zurich endorsed and incorporated Dr. Catanese's conclusions entirely as their own, the report, as discussed, fails to provide any reason to think that O'Dell's dizziness was caused by an underlying condition.  O'Dell's treatment records contained plenty of evidence linking his dizziness to the accident, and O'Dell's appeal specifically mentioned his dizziness as a basis for his claim.  Dr. Catanese's bare assertion that he didn't "see any proof" the two were related -- without discussing any of the evidence to the contrary -- is yet another conclusion lacking the specific explanation that ERISA

requires.  See Love, 574 F.3d at 397-98 ("The Plan did not explain why it chose to discount the near unanimous opinions of Love's treating physicians.  While plan administrators do not owe any special deference to the opinions of treating physicians, they may not simply ignore their medical conclusions or dismiss those conclusions without explanation."); Kalish v. Liberty Mut./Liberty Assur. Co., 419 F.3d 501, 510 (6th Cir. 2005) (reversing denial of benefits where an insurer's medical consultant failed to meaningfully rebut the claimant's medical evidence).

It's true of course that not every procedural violation of ERISA requires a benefits denial to be reversed. "Substantial compliance" will suffice, and it "exists where the claimant is provided with a statement of reasons that, under the circumstances of the case, permit[] a sufficiently clear understanding of the administrator's position to permit effective review." Ellis, 126 F.3d at 235 (internal quotation marks and citation omitted).  It's hard to see how Zurich's initial letter, its final letter, or the Catanese report could have given O'Dell any understanding (much less a sufficiently clear one) of Zurich's position regarding his dizziness.  That aside, Zurich failed to substantially comply with ERISA's requirements for yet another reason.  So far as the record

reveals, Zurich's final denial letter was the first to include a copy of Dr. Catanese's report, but that letter did not invite O'Dell to submit a second appeal or suggest any further appeal would be considered.  That's problematic because "a full and fair review of a claim and adverse benefit determination" is not possible unless the claimant has "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits[.]"  See 29 C.F.R. § 2560.503-1(h)(2)(iii).  It does not appear that Zurich ever afforded O'Dell an opportunity to appeal after providing him with Dr. Catanese's report.  As a result, O'Dell had no opportunity to obtain "a full and fair review <u>by the appropriate named fiduciary</u> of the decision denying the claim."  29 U.S.C. § 1133(2) (emphasis added); <u>see also</u> <u>Ellis</u>, 126 F.3d at 237 (observing that "opportunity to review the pertinent documents is critical to a full and fair review").

In sum, Zurich provided O'Dell with neither an adequate explanation of its decision to deny his claim nor a full and fair review of that decision, as required by § 1133. Those procedural violations of ERISA's requirements are yet another reason why Zurich's decision cannot be sustained.

IV. O'Dell's Motion for Summary Judgment

Having denied Zurich's motion, in part on procedural grounds, it is nevertheless observed that a procedural violation of § 1133 does not afford a claimant with "a substantive remedy if she has no entitlement to benefits under the terms of the Plan." Gagliano, 547 F.3d at 239-41. The question, then, is whether O'Dell is disabled within the meaning of the Policy.[15]

As noted, an individual is considered permanently disabled under the Policy if: (1) within 180 days of an accident, he (2) is unable to engage in his own occupation for twelve consecutive months, (3) as the result of an injury caused by the accident, and (4) is thereafter unable to engage in any occupation or employment for which he is reasonably qualified by training, education, or experience. See R. at 165.

The first factor is satisfied inasmuch as there is no dispute that O'Dell did not return to work beginning immediately after his accident, well within the 180-day limitation. Joint Stip. ¶ 6. As to the second factor, O'Dell informed Dr. Zakaib in early November 1999 that he was unable to return to work due

---

[15] O'Dell actually invokes the wrong definition, referring once again to the Policy's "Weekly Income" provisions.

to the effects of his accident, R. at 39, and, as of April 2001,
it was Dr. Adams' opinion that O'Dell had "a chronic pain
syndrome which [wa]s related to injuries sustained in motor
vehicle accidents"[16] that rendered him "permanently disabled and
unemployable for his previous occupation," R. at 90; see also R.
at 142 (noting in December 2003 that "[t]here [w]as absolutely
no way he c[ould]" return to his previous employment, and noting
diagnoses of, among other things, lumbosacral pain, and chronic
vertigo/dizziness, resulting in a poor tolerance for physical
activity).  As a result, it appears that O'Dell was unable to
engage in his previous occupation for twelve months following
the accident.  Regarding the third factor, the court has already
explained why there can be little doubt that O'Dell's chronic
vertigo and/or dizziness were caused solely by the accident,
rather than any pre-existing illness or disease.

That leaves the fourth factor of whether O'Dell was
unable to engage in any occupation or employment for which he
was reasonably qualified by training, education, or experience.
While the initial denial letter referred generally to "the
disability," the record evidence, when viewed in the light most

---

[16] The reference to "accidents" in the plural is assumed to be a
typographical error, as there is no mention in the record of any
motor vehicle accident other than that which took place on
September 29, 1999.

favorable to Zurich, is inconclusive on that issue.  The record contains no information about O'Dell's educational attainment, training, or work experience before AEP, making it impossible to ascertain the range of jobs for which he is reasonably qualified.  His work history as a supervisor at a coal processing plant suggests that his training and experience may be in trades that require some degree of physical exertion or which take place in an industrial setting.  Indeed, the complaint alleges more specifically that his duties "required him to walk many flights of stairs, climb ladders, perform moderate to heavy lifting, inspect equipment and walk on catwalks."  Compl. ¶ 3.  In its answer, Zurich professed to be without sufficient information to confirm or deny that particular allegation, but Dr. Zakaib's treatment notes are partially corroborative, indicating O'Dell's "work require[d] him on high cat walks and long hours of standing."  R. at 39.

Given the physically taxing nature of his previous work, it's certainly possible that O'Dell was precluded by his dizziness from taking up any similar occupation.  If, as he reported to Dr. Adams, he was prone to falling or nearly falling without warning, it is difficult to imagine how he could navigate a cat walk.  And if his condition left him unable to drive, as Dr. Adams recommended, R. at 142, it's questionable

whether O'Dell was capable of operating heavy machinery of the sort he may have encountered in the mining industry.

Even assuming O'Dell is permanently and totally disabled, the question remains as to whether it stems from his vertigo.  Dr. John opined that O'Dell's vertigo would subside over time, R. at 51, and Dr. Adams reported only that he "would be quite guarded in sending [O'Dell] back to work" due to his vertigo, R. at 142, without specifically opining that O'Dell was permanently and totally disabled as a result of his vertigo and dizziness without regard to his other symptoms.  These issues are yet to be resolved.  Consequently, O'Dell's motion for summary judgment is also denied.

### V. Remedy

Zurich failed to comply with ERISA's notice and review procedures, 29 U.S.C. § 1133, and it has not shown that it was entitled as a matter of law to deny O'Dell's claim completely based on the Policy's proof of loss provision or underlying condition exclusion.

"Normally, where the plan administrator has failed to comply with ERISA's procedural guidelines . . . , the proper course of action for the court is remand to the plan administrator for a full and fair review."  Weaver, 990 F.2d at

159. That remedy seems particularly appropriate here. If, upon further review on remand, it is found not only that O'Dell is permanently and totally disabled but his vertigo significantly contributed to it, then that factor is to be weighed, in particular, with both his pre-existing back condition and any injury to his back from the accident in order to determine whether the policy exclusion has been established; that is, that the pre-existing condition substantially contributed to his disability.

Furthermore, if it is found that O'Dell is entitled to recover, it is noted that the evidence in the record only documents his condition until 2004, and therefore would not permit the court to reach any conclusions about his eligibility for benefits during the entire 500-week period covered by the Policy unless the inquiry on remand is expanded. See R. at 165 (Policy provision stating that Zurich would pay benefits "for as long as the disability continues up to 500 weeks" provided that "[s]atisfactory proof of continued total disability [was] furnished" on an annual basis).

Given the ambiguities and gaps in the record, remand to Zurich for a proper inquiry and decision is deemed appropriate. See Love, 574 F.3d at 398 (noting that remand is proper unless the "evidence is so clear cut that it would be

71

unreasonable for the plan administrator to deny the application for benefits on any ground.").

## VI. Conclusion

Accordingly, it is ORDERED that the parties' motions for summary judgment be, and hereby are, denied but O'Dell's claim is deemed timely filed and this matter is remanded to Zurich for further review consistent herewith.  It is further ORDERED that Zurich conduct a thorough inquiry into whether, and for what period of time, O'Dell was permanently and totally disabled and make the full and fair review directed under "Remedy," all with the aid of such further evidence as O'Dell may promptly present on remand or as may later be requested or allowed by Zurich.  If Zurich concludes after reconsideration that O'Dell's claim should be denied, it must clearly explain the reasons supporting its decision and provide O'Dell with a reasonable opportunity to obtain a full and fair review of that decision.

The Clerk is requested to transmit a copy of this order to all counsel of record and any unrepresented parties.

DATED:  September 29, 2015

John T. Copenhaver, Jr.
United States District Judge

72